IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARK J. READ, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Civil Action No. 09-539-GMS |
| | ) |
| MICHAEL E. DELOY, Warden, | ) |
| and ATTORNEY GENERAL OF | ) |
| THE STATE OF DELAWARE, | ) |
| | ) |
| Respondents. | ) |

Mark J. Read. *Pro se* petitioner.

Paul R. Wallace, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware. Counsel for Respondents.

**MEMORANDUM OPINION**

Sept 26, 2012
Wilmington, Delaware

Sleet, Chief Judge

Pending before the court is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by petitioner Mark J. Read ("Read"). (D.I. 1; D.I. 5) For the reasons discussed, the court will deny the petition.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At approximately 11:00 p.m. on Wednesday, July 16, 1980, Catherine Hughes finished her workday at the Woolworth's store in the Blue Hen Mall. (D.I. 12 at 2) As she was walking out of the mall with a co-worker, her friend stopped to make a phone call and Ms. Hughes continued out of the mall alone. When she stopped to throw away a match in front of the movie theatre located along side of the mall, she was approached by Read and Harry Turner. Turner asked for a cigarette and Ms. Hughes complied. Ms. Hughes then continued walking toward her vehicle. When she arrived at her vehicle, Read and Turner again approached her. One of the men asked Ms. Hughes if she was expecting anyone else to ride with her. She replied that she had to pick up her boyfriend and then got into the driver's seat of her car. *Id.*

Turner then pushed his way into the driver's seat, forcing Ms. Hughes into the center console. Turner tried to get the keys from her, but Ms. Hughes refused to turn over the keys to the vehicle. Turner then choked Ms. Hughes until she released the keys. He then unlocked the passenger door so Read could enter the vehicle. Read, now in the front passenger seat, held Ms. Hughes, pushing down on her neck so that her head was below the dashboard. Turner turned on the ignition as Read ordered Ms. Hughes to take off her clothes. As Turner began to drive the vehicle he put his hand on Ms. Hughes' leg and Read rubbed her back. Read then ripped off Ms. Hughes' skirt and began to pull on her shirt, tearing it at the neckline. Ms. Hughes stated that the

1

shirt belonged to her sister and then took off the shirt herself so that it would not tear any further. At this point, Ms. Hughes began to bargain for her safety and her life, telling Turner and Read they could have the vehicle if they would just let her go. But her offer was to no avail. *Id.* at 2-3.

Ms. Hughes was ordered into the backseat of the car while Turner continued driving. Read got into the backseat with her and attempted to have intercourse with her. Her position on the seat prevented this from happening, so Read pulled her into a better position and began to vaginally rape Ms. Hughes. Turner asked Read if it was any good. Read continued to have vaginal intercourse with Ms. Hughes until Turner stopped the car in front of an abandoned house. At this point, Turner got into the backseat of the vehicle and also vaginally raped Ms. Hughes. At the same time, Read forced Ms. Hughes to have oral interourse with him and told her not to bite him. Once Turner was finished, he returned to the driver's seat, turned to Read and said, "you know what to do." Read then choked Ms. Hughes until she lost consciousness. *Id.* at 3.

Later, Read and Turner removed Ms. Hughes from the vehicle. Read held Ms. Hughes' head by the tires of the vehicle, while Turner drove back and forth in an effort to run over her head. At one point, Turner stopped the vehicle, parking one of its tires on top of Ms. Hughes' hair, thereby trapping her on the ground by the vehicle, and leaving her naked and unconscious. One of the men then used a match to set the vehicle on fire and the men fled. *Id.*

A passing motorist found Ms. Hughes, naked and battered on the side of the street. The motorist stopped to help Ms. Hughes and discovered a large amount of blood on her face and head. He asked her if she was hurt anywhere else, and she pointed to her groin area. He then saw blood on her legs as well. The motorist drove Ms. Hughes to Kent General Hospital for treatment. *Id.*

2

Police located the burned vehicle, and inside they found a watch that belonged to Read's stepfather. Ms. Hughes was unfamiliar with Read and Turner prior to July 16, 1980, but was able to provide a description of both her attackers. After some investigation, police identified Read and Turner as suspects, and Ms. Hughes was shown two photo line-ups, one containing a photo of Read and hte second with a photo of Turner. Ms. Hughes was able to identify both Read and Turner as her attackers on the evening of July 16, 1980. *Id.* at 4.

Read was arrested on July 31, 1980, and subsequently indicted on the charges of attempted first degree murder, first degree rape, and first degree kidnaping. Read entered a guilty plea to attempted first degree murder, and he was sentenced to life in prison with eligibility for probation or parole. *Id.* at 1.

In 1982, Read filed a standard motion for reduction of sentence in the Superior Court, which was denied. That same year, Read filed a writ of habeas corpus in the Superior Court, which was dismissed. *Id.*

In 2004, Read filed a motion for periodic review of sentence in the Superior Court. The motion was denied. *Id.*

Read filed applications for parole in 1990, 1994, 2006, and 2008. All of his applications were denied. (D.I. 14)

## II. GOVERNING LEGAL PRINCIPLES

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)(internal citations and quotation marks omitted). Pursuant to AEDPA, a federal court may

3

consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). AEDPA imposes procedural requirements and standards for analyzing the merits of a habeas petition in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002); *see Woodford*, 538 U.S. at 206.

Absent exceptional circumstances, a federal court cannot grant habeas relief unless the petitioner has exhausted all means of available relief under state law. 28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-44 (1999); *Picard v. Connor*, 404 U.S. 270, 275 (1971). AEDPA states, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that –
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)(i) there is an absence of available State corrective process; or
> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

### III. DISCUSSION

Read has applied for parole four times from 1990 to 2008, and each application has been denied. Though the reasons for the denial have varied, each decision was based, at least in part, on the violent nature of the offenses committed by Read. The sole claim in Read's petition alleges that he cannot obtain an "impartial" review of his sentence because the State continues to use the original charges against him that were dismissed pursuant to his plea agreement as the

4

basis for opposing his parole applications. Specifically, he contends that it is illegal for the Board of Parole to consider and rely on the nature of his offenses dismissed by the State as part of a plea agreement in considering him for parole. Liberally construing Read's claim, he appears to argue that denial of parole due to the nature of the offenses originally charged is a violation of his right to substantive due process.

The court concurs with the State's assertion that the exhaustion requirement is excused in this case, because Delaware does not have a procedure by which a prison can challenge a decision made by the Board of Parole. (D.I. 12 at 5) Therefore, the doctrine of exhaustion/procedural default does not preclude the court from reviewing the merits of Read's claim.

"There is no right under the Federal Constitution to be conditionally released before the expiration of a valid sentence, and the States are under no duty to offer parole to their prisoners." *Swarthout v. Cooke*, ___ U.S. ___, 131 S.Ct. 859, 862 (2011). However, if a State creates a liberty interest, "the Due Process Clause requires fair procedures for its vindication - and federal courts will review the application of those constitutionally required procedures." *Id.*

A Delaware prisoner does not have a liberty interest in being released on parole. *See Eskridge v. Casson*, 471 F. Supp. 98, 101 (D. Del. 1979). However, according to Third Circuit precedent, "once a state institutes a parole system, all prisoners have a liberty interest flowing directly from the due process clause in not being denied parole for arbitrary or constitutionally impermissible reasons." *Block v. Potter*, 631 F.2d 233, 236 (3d Cir. 1980).[1] When, as here, a

---

[1] Although "the vitality of *Block* is questionable, it must be followed until overturned." *Walls v. Att'y Gen. of Pa.*, 2007 WL 4190790, at *3 n.4 (W.D. Pa. Nov. 26, 2007)(questioning *Block*'s holding that substantive due process can be violated despite the absence of a liberty

5

petitioner raises a substantive due process claim with respect to a parole board's decision, the petitioner must establish that the challenged action shocks the court's conscience. *See Evans v. Secretary, Pa. Dep't of Corrs.*, 645 F.3d 650, 659 (3d Cir. 2011). Conduct "most likely to rise to the conscience-shocking level is conduct intended to injure some way unjustifiable by any government test." *Chavez v. Martinez*, 538 U.S. 760, 775 (2003). Thus, a Board of Parole may not arbitrarily deny parole on the basis of impermissible criteria such as race, religion, or the exercise of free speech rights, or on criteria with no rational relationship to the purpose of parole. *See Block*, 631 F.2d at 236-37.

In this case, Read's sole argument is that his applications for parole should not have been denied based on the facts of offenses which were dismissed by the State as part of a plea agreement. However, the Board's most recent decision explains that Read's parole request was denied because of the Board's belief that Read continues to pose a risk to the community. This conclusion was only reached after the Board considered the following three factors: (1) the extremely violent nature of the offense; (2) the impact on the victim; and (3) the Attorney General's opposition. (D.I. 14, Board of Parole's decision letter dated November 24, 2008). The Board also recommended that Read "work with [his] counselor to develop a plan for continued mental health counseling, and substance abuse, violent offender and sex offender treatment." *Id.*

As an initial matter, the court notes that the Board of Parole's use of the word "offense" in the singular form suggests that the Board only considered the violent nature of the attempted first degree murder charge to which Read pled guilty, rather than the violent nature of the charges

interest).

which were dismissed. The court could dismiss the instant petition on the basis of this factual inaccuracy alone.

Nevertheless, the court also concludes that Read's instant argument fails to demonstrate a violation of his right to substantive due process. Simply stated, Read has not demonstrated that any of the factors considered by the Board shock the conscience, or that such factors constitute behavior intended to injure Read in a way that is not justified by any legitimate government interest. *See McGinnis v. Royster*, 410 U.S. 263, 277 (1973)(it is a "legitimate desire of the state legislature to afford state prison officials an adequate opportunity to evaluate both an inmate's conduct and his rehabilitative progress before he is eligible for parole."); *Prever v. Barone*, 428 F. App'x 218, 220 (3d Cir. 2011)(DOC's negative recommendation is a legitimate penological concern); *Gordon v. Wenerowicz*, 2011 WL 5509538, at *4 (M.D.Pa. Nov. 10, 2011)(denying parole because petitioner poses a risk to the community is not "conscience shocking."). Accordingly, the court will deny Read's substantive due process claim as meritless.

## IV. CERTIFICATE OF APPEALABILITY

When a district court issues a final order denying a § 2254 petition, the court must also decide whether to issue a certificate of appealability. *See* 3d Cir. L.A.R. 22.2 (2011). A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The court concludes that Read's petition does not warrant federal habeas relief. Reasonable jurists would not find this conclusion to be debatable. Consequently, the court

declines to issue a certificate of appealability.

## V. CONCLUSION

For the reasons stated, the court will deny Read's petition for habeas relief filed pursuant to 28 U.S.C. § 2254. An appropriate order shall issue.